### CATHERINE A. M. PECQUET *v.* PECQUET'S EXECUTOR et al.

Actions relating to the ownership of the dotal or paraphernal property of the wife, or of some real right belonging to her, must be brought by the wife, duly authorized by her husband, or by the judge, if he fails to do it.

The right of either party to a bill of exceptions is reserved to the court, and the court is to pass upon the admissibility of the evidence.

The only mode pointed out by law to test, in this Court, the correctness of the opinions of inferior courts, is by bill of exceptions, and in no other form can it revise such opinions. It is only when the question decided is presented by the pleadings that a bill of exceptions may be dispensed with.

Contracts are governed by the law of the place where they are entered into. The forms, the effects, and the prescription of actions are governed by the law of the place where they are brought. C. P 13.

An exception to the general rule, that a foreign law must be proved in our courts, is made when that law was once the law of this State.

The laws of France must be proved; because, having been abrogated as the prevailing general law of the province many years prior to our acquisition of Louisiana, and never thereafter adopted as such, we do not possess judicially the means of knowing what French laws in particular were retained by Spain, and handed down to us.

If a donation has been executed, that is, if the donee has been put by the donor into corporeal possession of the effects to be given, the donation, though not accepted in express terms, has full effect.

A *dilatory exception*, as for instance a premature suit, might have been successfully urged in *limine litis*, but cannot avail a party after a judgment by default.

An obligation *in solido* is not presumed; it must be expressly stipulated. This rule ceases to prevail only in cases where an obligation *in solido* takes place of right by virtue of some provisions of the law.

A person may, in his own name, make some advantage for a third person the condition or consideration of a commutative contract, or onerous donation; and if such third person consents to avail himself of the advantage stipulated in his favor, the contract cannot be revoked.

All property which is not declared to be brought in marriage by the wife, or to be given to her in consideration of the marriage, or to belong to her at the time of the marriage, is paraphernal.

The wife has the right to administer personally her paraphernal property, without the assistance of her husband.

The wife who has left to her husband the administration of her paraphernal property, may afterwards withdraw it from him.

The wife has, even during marriage, a right of action against her husband for the restitution of her paraphernal effects and their fruits, as above expressed.

Suretyship is an accessory promise by which a person binds himself for another already bound, and agrees with the creditor to satisfy the obligation, if the debtor does not.

All persons have the capability to contract, except those whose incapacity is specially declared by law. These are persons of insane mind, slaves, those who are interdicted, minors, married women.

The incapacity of the wife is removed by the authorization of the husband, or in cases provided by law, by that of the judge.

The authorization of the husband to the commercial contracts of the wife is presumed by law, if he permits her to trade in her own name; to her contracts for necessaries for herself and family, where he does not himself provide them; and to all her other contracts, when he is himself a party to them.

The unauthorized contracts made by married women, like the acts of minors, may be made valid, after the marriage is dissolved, either by express or implied assent.

Under the provisions of our law the contract of suretyship is of a mixed character.

The obligation of the surety is to pay the whole debt; but this solidarity is tempered by the right of division. The right, however, vests in *facultate*.

The surety has the right to demand the division, but until the right is exercised the obligation is solidary.

When the paraphernal property is administered by the husband, or by him and the wife indifferently, the fruits of this property, whether natural, civil, or the result of labor, belong to the conjugal partnership, if there exist a community of gains. If there do not, each party enjoys as he chooses, that which comes to his hands; but the fruits and revenues which are existing at the dissolution of the marriage, belong to the owner of the things which produce them.

The suretyship cannot exceed what may be due by the debtor, nor be contracted under more onerous conditions.

It may be contracted for a part of the debt only, or under more favorable conditions.

The suretyship which exceeds the debt, or which is contracted under more onerous conditions shall not be void, but shall be reduced to the conditions of the principal obligation.

A man may be surety without the order or even the knowledge of the person for whom he becomes surety.

Subrogation takes place of right for the benefit of him who, being bound with others, or for others, for the payment of the debt, had an interest in discharging it.

PECQUET
v.
PECQUET'S EX'R.

APPEAL from the Second District Court of New Orleans, *Morgan*, J. *Durant & Hornor for plaintiff.*—Plaintiff, a married woman, alleging her domicil in Virginia, sues the succession of her husband's father, on the following contract, and makes her husband's mother a party to the suit :

"Whereas, a marriage was consummated in the year 1852, between Nemours Pecquet, late of New Orleans, in the United States, and Catherine Ambler Moncure, daughter of Henry W. Moncure, of the city of Richmond, in the State of Virginia, in the said United States of America, of which marriage a daughter named Louise has been born, and on the celebration of the said marriage no marriage agreement or settlement was entered into. And whereas, since the said marriage, the said Henry W. Moncure, father of the said Catherine, has paid and advanced to his said daughter the sum of thirteen thousand five hundred dollars, which sum has gone into the hands of the said Nemours, her husband. And whereas, the said Henry W. Moncure is willing to advance the further sum of thirteen thousand five hundred dollars on the draft of the said Catherine, and in like manner to go into the hands of her said husband, but on the condition and with the express understanding that a guaranty shall be given, so as effectually to secure the said Catherine Pecquet and her said child, and any other children which may be born of her, to be realized and made available for her use, so that the annual interests on this said sum of twenty-seven thousand dollars shall be annually paid to her, through the agency of a trustee, on the death of her said husband, or in the event of his failure in business, so that she and her said child or children shall no longer receive at his hands a support necessary to her condition in life. And whereas, in consideration of the sums already advanced, and of the further sum of thirteen thousand five hundred dollars to be paid and advanced by the said Moncure as aforesaid, Louis Joseph Pecquet and Marie, his wife, now resident in Paris, in France, father and mother of the said Nemours, have agreed, and do by these presents agree and covenant with the said Catherine Ambler Pecquet and Louise, her child, and such other children as may be born of her, the said Catherine, that in the event of the death of the said Nemours Pecquet, or in case of his failure in business or becoming bankrupt, they, the said Louis Joseph Pecquet and Marie, his wife, will and do hereby guaranty the said sum of twenty-seven thousand dollars, to be paid to a trustee to be nominated by her, the said Catherine, and by him to be invested, and the annual interest of which is to be paid for the necessary support of her and her said children; her said husband, if alive, to participate thereof; but the said Louis Joseph Pecquet and Marie reserve the right, if either contingency above mentioned shall occur during their joint lives, that so long as he or she live, they may be permitted to pay six per cent. interest, on the said sum of twenty-seven thousand dollars, annually, for the purposes aforesaid, instead of paying the principal sum, and at the death of both of them the said sum, in money or property of equivalent value, shall be paid or conveyed to the said Catherine's trustee, for the purposes aforesaid. And it is further understood and agreed, that this guarantee shall cease

PECQUET
v.
PECQUET'S EX'R.

to have any legal force and effect, if at any time during his life or by his testamentary dispositions at his death, the said Nemours shall have, by due and legal settlement, conveyed the said sum of twenty-seven thousand dollars to a trustee, for the use and benefit of the said Catherine and her child or children, in available funds, he not having failed in business during his life.

(PECQUET.)

MARIE PECQUET.      [L. S.]
L. SOULIE.      [L. S.]

Witnessed by W. S. Chase.

"Je soussigné, interprète-traducteur-juré, assermenté par la cour Impl. Paris et le Tribunal de Commerce de la Seine pour les langues Européennes, certifie, que le texte français ci-dessus est conforme au texte anglais écrit en regard et vice versa. En foi de quoi j'ai signé le présent à Paris ce vingt-quatre juin mil huit cent cinquante-quatre.

F. ARMFA.

Cinq lignes du texte anglais rayées comme nulles.

F. A.

Be it known, that on this 24th day of June, A. D. 1854, before me, D. K. McRae, consul of the United States of America at Paris, France, personally appeared Louis Joseph Pecquet and Marie, his wife, to me known to be the persons named in and who executed the foregoing instrument, and acknowledged that they severally executed the said instrument, for the uses and purposes therein mentioned.

D. K. McRAE, U. S. C.

The court authorized petitioner to sue.

Defendants excepted to the action on two grounds :

1. That the plaintiff cannot stand in judgment without the authorization of her husband, whose legal domicil is in France, and that the court of her domicil is the only court competent to authorize her to bring suit, after notice to her husband to state reasons why he refuses to authorize her.

2. That the petitioner shows no cause of action, because this action can not be maintained by the plaintiff before obtaining a separation of property from her husband, and on showing the utter impossibility to recover her matrimonial claims against him after a full discussion of his property.

The first exception gave the judge below much trouble and embarrassment, when, at the close of the term, June 27th, 1859, he ordered the exception to be continued. Afterwards, however, the plaintiff's husband was ruled to show cause why he should not authorize and assist his wife in bringing and maintaining this suit. This rule was served personally ; and no exception or answer to it having been filed, was regularly made absolute. The exceptions were thereupon dismissed; the second branch thereof having been virtually transferred to the merits.

The executor and widow Pecquet then answered by the general denial, and averred that the instrument sued on could have no effect whatever, either under French or Louisiana law, as it contained a substitution and a *fidei commissum* reprobated by law, and the stipulations therein contained never having been excepted or executed. Farther, that the contract, if

legal, could be satisfied by the payment of the interest; and lastly, plain-
tiff was without remedy for the reasons set forth in the second branch of
exception, noticed above.

Judgment was rendered against the succession of Pecquet *père* for
$13,500, with interest at six per cent. from June 1859, and against his
widow for the like sum and the like interest; this judgment not to be exe-
cutory for this principal so long as the said widow shall pay to the plain-
tiff an annual interest of six per cent. on the said amount ($13,500), the
defendants to pay the costs. Defendants appeal; there is a joinder in
appeal and prayer to amend, in favor of plaintiff.

The facts of this case are as follows :

The plaintiff, Miss Moncure, married Pecquet *fils* in 1852, and was domi-
ciled in Paris, where the husband carried on a commercial business. Miss
Moncure's father advanced to his daughter, after her marriage, $13,500,
which went into the hands of Pecquet *fils* prior to 24th June, 1854. On
the 5th of April, 1854, Pecquet *père* (whose succession is defendant) wrote
a pressing letter to Miss Moncure's father, detailing the embarrassed cir-
cumstances, for want of money, of both Pecquets. His language is, "On
the contrary, if you do not (let me draw on you) I will not be able to pay
the debt, and will be protested, and be obliged to quit Paris before he gets
here, etc. Thus, my dear Mr. Moncure, I beg of you to come to succor
and secure the happiness of your children, etc., etc."

Urged in this impressive manner, plaintiff's father, acting in entire ig-
norance of the exact position of the affairs of Pecquet *père et fils*, consent-
ed to make a further advance of $13,500 to his son-in-law, for his daugh-
ter's and grandchildrens' benefit; and as he was compelled to rely upon
the truth of the representations of Pecquet *fils'* business as made by Pec-
quet *père*, nothing was more reasonable than that Pecquet *père* should
vouch for the entire safety of the advance, and the entire truth of his
representations, by becoming personally responsible therefor.

With a parent's solicitude for the welfare of his child and grandchild-
ren, and with a sincere desire that the money thus advanced should inure
to their benefit, Moncure insisted upon the written guaranty herein sued
upon, signed by Pecquet *père* and wife, and attested by the American
consul. By this instrument Pecquet *père* and wife bound themselves to
pay to plaintiff's trustee the $27,000, to be invested, and the annual in-
terest thereof to be paid for the necessary support of plaintiff and her
said children, in the event of the death of her husband, or in case of his
failure in business, or becoming bankrupt.

The letters and other proofs in evidence, and not excepted to, fully
make out the happening of one of the conditions expressed in the con-
tract. Plaintiff's husband has failed in his business, and plaintiff and her
children no longer receive at his hands any support whatever.

The case presents the following questions for adjudication.

1. Was the lower court legally vested with jurisdiction over this suit ?

2. Is the contract sued upon exigible under the jurisprudence of this
State ? Does it contain any substitution or *fidei commissum,* or is it in any
way repugnant to good morals or public policy ?

3. Has the condition happened on which the contract became execu-
tory ?

PECQUET
v.
PECQUET's Ex'r.

4. Is any acceptance of it on the part of plaintiff required?

5. Have Pecquet, husband and wife, bound themselves, in the contract, *in solido* towards plaintiff? or how are they liable?

6. From what date does interest run?

7. Was it necessary, before suing on the contract, for plaintiff to sue her husband and exhaust her recourse on him, before calling upon defendants?

1. The succession of Pecquet *père* having been regularly opened in the Second District court, any claim against it could be brought only in that tribunal. And by reference to Louisiana Code, 123 *et seq.*, and Code of Practice, 107, it will be seen that the judge was legally authorized to empower the plaintiff to sue, though the husband had positively inhibited her from so doing. The general rule of law undoubtedly is, that the court of the husband's domicil is the proper court to authorize the wife to sue. This applies, however, to courts under the same general jurisdiction: for instance, the courts of France, of Louisiana, of New York, etc.; and the principle then becomes equivalent to a plea of domicil, and is governed by the same rules. If Pecquet *fils*, when called upon to show cause why his wife should not be empowered by the court to sue, had urged his plea of domicil in some other parish of this State, then the rule would perhaps be applicable. But as he was domiciled elsewhere, and out of this State, the lower court properly authorized the wife to sue; and it was by no means necessary to go through the vain formality of citing the husband to show cause why she should not be authorized.

But what possible right have the defendants to urge this objection? They might, possibly, be authorized to rule the plaintiff to cancel the authorization of the judge, though we think the husband only has the right to complain; but they cannot except, for this would be as foolish as contending against the effect of the thing adjudged. See 88th rule in Equity, Laws United States courts, p. 499.

2. The legality of the contract sued upon is impugned, on the ground that it is contrary to public policy, because it contains a prohibited substitution and *fidei commissum.*

The proof of this proposition clearly devolves on the defendants; and even if the legality of the contract were doubtful, or presented a double aspect, one of which brings the case within, the other leaves it without the scope of prohibitory law, the contract will be sustained. 3 An. 157, 239, 494; 5 An. 619, 684.

Is there any provision of the *lex fori* or *lex loci* which strikes the contract with nullity? Both the laws of France and of Louisiana (Code Napoleon, 896, Louisiana Code, 1507) prohibited substitutions. But this contract contains no substitution; and defendants' counsel, thus far, has entirely failed to show in it any substitution or *fidei commissum.*

Viewed from the stand point of the laws of France, the contract is in direct conformity with the Code Napoleon 1048, which says:

"Les biens dont les pères et mères ont la faculté de disposer, pourront être par eux donnés, en tout ou en partie, à un ou plusieurs de leurs enfans par acte entre vifs ou testamentaires, avec la charge de rendre ces biens aux enfans nés ou à naître, au premier degré seulement, des dits donataires."

·And in the light of our own Code, the disposition *inter vivos* or *mortis*      PECQUET
*causa*, by which the usufruct is given to one and the naked property to      PECQUET s EX'R.
another, "shall not be considered a substitution, and shall be valid."
Louisiana Code, 1508, 1509.

Is there anything immoral, or contrary to public policy, the good order
·of society, or the institution of the family, for a father to love his
·daughter and her·issue? This love is the cause of this contract. The
·desire to shield his daughter and her issue from the consequences of the
·natural or civil death of her husband, is the principal motive of the con-
tract, definitely expressed therein, and this matter was "understood by
both parties, reciprocally communicated, and resulting in both parties
from a free and deliberate exercise of the will," at the time of signing the
contract. We confess our entire inability to see anything wrong in
this contract.

On the contrary, it seems to us in every way commendable, and· in
strict accordance with the spirit of our laws. It would indeed be singu-
lar if the laws of any civilized country should reprobate and stamp with
nullity such a contract as the one now before this honorable court.

3. The conditions on which the contract should become executory are,
"in the event of the death of the said Nemours Pecquet, or in case of his
failure in business, or becoming bankrupt." The evidence clearly shows
that Pecquet *fils* was utterly ruined before leaving France. Indeed, our
adversaries do not seriously deny it, and are as anxious as ourselves that
the case should be definitively disposed of.

4. The plaintiff has appointed her trustee under the contract, and has
applied for the enforcement of it, by instituting this suit. No better
acceptance can be required. This is an equitable action. Code of Prac-
tice, 35. The contract is for the advantage of a third person. Such
third person may consent, at any time during the existence of the con-
tract, to avail himself of the advantage stipulated in his favor. Louisiana
Code, 1884. No better or more conclusive indication of this consent can
exist than bringing suit to enforce the contract.

5. The lower judge considered the defendants liable jointly to the
plaintiff, and so decreed.

It is true, the husband and wife both bind themselves by signing the
act. The motive for this was probably to bring home to both their con-
sent to the contract. It was important, in the judgment of him who ad-
vanced the $27,000, to be able to show, at any time, that the guaranty
was well known to both obligors, so that neither might resist complying
with its obligations, on the ground of surprise, ignorance, illegality, etc.,
etc. But the presumption, both of French and Louisiana law, is, that
married persons are in community of property (Code Napoleon, 1400;
Louisiana Code, 2369); and if such be not the case, the fact must be
shown by them. This has not been done here. If a community of pro-
perty existed between the defendants, it was dissolved by the death of
the husband, and his succession is liable for the totality of the debts of
the community. This contract was clearly a contract of the community,
and the husband, as the head of the community, owes the whole sum
sued for to the creditor; that is, he is bound *solidairement*. 3 Troplong,
Mariage, §§ 1771, 1772.

27

PECQUET     And the same author explains, in the clearest manner, in the sections
PECQUET'S EX'R. 1773, 1774, of the same work, that the wife is bound only for her half,
unless she has consented *in solido.*

We have joined in the appeal, and prayed for an amendment of the
judgment.

6. Plaintiff's original petition claimed interest from judicial demand.
By a supplemental petition, interest was prayed for from 1st October,
1858, ''when both the principal and interest of the claim set forth in the
original petition became due and demandable.''

We submit that, in conformity to the act of 1852, page 95, we are en-
titled to an amendment of the judgment of the lower court in this respect.

7. Defendants contend that they are securities for plaintiff's husband,
and that they cannot be sued before plaintiff obtains a judgment of sepa-
ration of property from her husband, and shows that the same cannot be
satisfied by the sale of his share in the succession of his father, or by any
other means.

This is virtually a plea that this suit is premature, and rests entirely
upon the assumption that defendants are securities for the husband.   If
the assumption is false, the conclusion is false.   Hence, the relations of
the parties to this contract become a material point of inquiry.

The contract in question is between the plaintiff's father and the de-
fendants.   It was originally prepared in English, as appears on the face
of it, and was translated into French by the interpreter of the Imperial
court of Paris.   It bears evident marks of having been drawn up by one
familiar with the doctrine of trusts of the English and American law.   As
the contract must not be confounded with the instrument in writing by
which it is witnessed (Louisiana Code, 1755), so your honors are bound
to give legal effect to the contract according to the true intent of all the
parties.   Louisiana Code, 1940.   By reading carefully the whole instru-
ment, it clearly appears that Henry W. Moncure advanced the $27,000 to
his daughter's husband, for the use and benefit of his daughter and her
children; the children to have the ownership and their mother the usu-
fruct.   The obligation of the defendants is therefore to the plaintiff's
children; and it is neither a contract of securityship by which they
secure the payment of a debt due by their son (which, by the way, they
had a legal right to do, if they so pleased), nor a penal or collateral obli-
gation.   On the contrary, the instrument in writing evidences, on the
part of the defendants, a *principal obligation,* with a suspensive condi-
tion.   (Louisiana Code, 2016, *et seq.,* 2038.)   Their obligation is called a
guaranty, it is true; but it is neither expressly nor impliedly a guaranty
that they bind themselves for another already bound, and agree with the
creditor to satisfy the obligation, if the debtor do not.   It is a contract
of guaranty that defendants will pay to a trustee for the wife and children
$27,000, in the event of the death, failure or bankruptcy of their son.
The event happening, the defendants are bound purely and simply; or,
as the lower judge expresses it, ''The condition has arrived and their
obligation is exigible.''

Admitting, for argument, that defendants are mere securities for the
husband towards the wife—a position, it seems to us, entirely opposed to
the intention of all parties—we then enquire, what possible good could

be achieved by pursuing the course suggested by defendants' counsel? <span style="float:right">PECQUET <i>v.</i><br>PECQUET's EX'R.</span> Supposing the wife's suit was to result in a judgment for a smaller sum than $27,000, would defendants be relieved *pro tanto?* We think not, because their obligation is primarily to the children, and not the wife. What benefit would accrue by liquidating the wife's claim on her husband, issuing execution, and getting a return of *nulla bona?* The proof is positive and uncontradicted, that the husband has left France permanently; that before he left he was "completely ruined." It would be worse than useless to insist upon such a course.

But if defendants are sureties for the husband toward the wife, and this suit is premature, this prematurity must result from some provision of law, which defeats our action in its present shape. But there is no such provision of law. If the husband be the principal debtor, and has not paid the claim, the action against the security is well founded, and must be sustained. Troplong, Cautionnement, § 231, 232.

The action may be delayed by the dilatory exception of discussion (Louisiana Code, 3014, 3015); but in this instance, this *legal favor accorded to securities* has been asked, without any compliance with the provisions of law, which are conditions precedent to its exercise. Louisiana Code, 3016; 11 La. 136; 7 An. 142, 621; 13 An. 196.

Besides, if defendants are sureties, they are entitled to a full subrogation to all the rights of the creditor. But defendants are silent as to what subrogation they desire. No matter to whose rights they are so entitled, whether to Moncure's, his daughter's [or her children's, it is clear they must first pay the plaintiff's claim, before they can exercise the rights of the principal creditor against Pecquet *fils.* Whatever these rights may be, nothing intervenes to prevent a full subrogation. 12 An. 9.

But the contract is not one of suretyship, as we have before shown, but a principal, independent, contract, now exigible, and which we ask the court to enforce.

*Janin & Magne for defendants and appellants.*—The plaintiff was married in 1852 to Pierre François Pecquet, designated in the family and throughout the evidence in this record by the name of Nemours Pecquet.

No marriage contract was entered into, but some time after the marriage, Henry W. Moncure, the plaintiff's father, made her a donation of $13,500, which went into the hands of her husband, who was then residing with his wife, and engaged in commercial business, in Paris, in France.

On the 5th of April, 1854, Louis Joseph Pecquet, the father of plaintiff's husband, who also resided in Paris, wrote to plaintiff's father, the said Henry W. Moncure, representing that Nemours Pecquet was embarrassed in his business, in consequence of an impending commercial crisis, and the withdrawal of the usual credits of the bankers. He reminded Moncure of the promises he had made to Nemours in late letters, of pecuniary assistance; assured him that, by means of that assistance, Nemours would be able to sustain himself, and added that, in order to afford temporary relief to Nemours, he (the writer) had raised a loan of 25,000 francs, on mortgage, for three months, the repayment of which was out of his power without the assistance promised by Moncure to Nemours.

PECQUET        Shortly afterwards, Moncure arrived in Paris.   He agreed to advance·
PECQUET's Ex'R. to his daughter a further sum of $13,500, to go,.like the former gift of the·
same amount, into the hands of the husband, Nemours Pecquet, but on
condition that a guaranty should be given by the father and mother of
the husband, that in case of the death of the husband, or in the event of
his failure in business, so that the wife and her child or children should
no longer receive at his hands a support necessary to her condition in
life, the annual interest on this sum of $27,000, composed of the two ad-
vances of $13,500 each, shall be annually paid to her, through the agency
of a trustee.   This proposition being accepted, Louis Joseph Pecquet and
Marie Pecquet, the father and mother of the husband, agreed to "gua-
rantee the said sum of $27,000 to be paid to a trustee to be nominated by
her (the plaintiff), and by him to be invested, and the annual interest of
which is to be paid for the necessary support of her and her children; her
husband, if alive, to participate thereof ; but the said Louis Joseph and
Marie Pecquet reserved the right, if either contingency above mentioned
shall occur during their joint lives, that so long as he or she live, they may
be permitted to pay one-half per cent. interest on the said sum of $27,000,.
annually, for the purposes aforesaid, instead of paying the principal sum,
and at the death of both of them, the said sum in money or property of
equivalent value, shall be paid or conveyed to the said Catherine's trus-
tee, for the purposes aforesaid."

This contract was executed at Paris, on the 24th of June, 1854, in two
originals, one in English and the other in French, and the two originals
were signed both by Louis Joseph Pecquet, and Marie, his wife.

The petition alleges that "one of the contingencies in the said act of
guaranty has taken place, that her husband has failed in business, and is
no longer able to render to the petitioner and her children a support ne-
cessary to her condition in life;" that her husband's father has died, leav-
ing real estate in the State of Louisiana ; that his succession has been
opened in the Second District Court of New Orleans, and is administered
by Ernest Quertier, of New Orleans, as dative testamentary executor ;
that the widow of the said Louis Pecquet, the other party to said act of
guaranty, is also represented in this city by a special attorney in fact ;
that, in consequence of the above mentioned circumstances, the succes-
sion of said Louis Joseph Pecquet, and Marie Pecquet, his widow, are
indebted in the said sum of $27,000, with six per cent. interest.   The pe-
titioner further represents that her husband is absent from this State, and
fails and refuses to authorize her to bring this suit; that he is unable to
restore to her the said sum of $27,000; that, inasmuch as the act of gua-
ranty provides for the appointment of a trustee by herself, to whom the
said sum is to be paid over for investment, she desires her father, the
Henry W. Moncure, to be appointed for this purpose.   She therefore
prayed for judgment against the succession of her father-in-law and against
her mother-in-law in solido, for $27,000, with six per cent. interest, and
that her father, the said Henry W. Moncure, be recognized and appoint-
ed trustee to carry out the provisions of the act of guaranty.   The court
authorized her to bring this suit, and when, afterwards, the plaintiff's
husband came to this city, a rule was taken on him to show cause why he
should not authorize her to prosecute this suit, or why, in default there-

of, the court should not grant the necessary authorization. The husband neither answered or appeared, and thereupon the rule was made absolute.

This suit was instituted on the 6th of June, 1859, but already, previously, the plaintiff had appointed her father trustee under the act of guaranty, by an instrument executed at Richmond, Virginia, on the 18th of May, 1859. This appointment is,·of course, a nullity, because it was not authorized by her husband, who, as the document itself shows, then resided in Richmond with his wife. By a letter dated at Richmond, the 11th of May, 1859, and written when this deed was in course of preparation, but not yet executed, to his father-in-law, the plaintiff's husband in respectful but firm language objected to his wife's claim under the act of guaranty, and gives his reasons for it, which, whatever their weight may be in law, are entitled to our sympathy and respect.

The defendants excepted to the claim set up in the petition, on the ground "that the plaintiff shows no cause of action, because this action cannot be maintained by the plaintiff before obtaining a separation of property from her husband, and on showing the utter impossibility to recover her matrimonial claims against him after a full discussion of his property."

And this exception having been overruled, the defendants said, for answer, that "the instrument upon which this suit is brought can have no effect whatever, either under our laws or the laws of France, same containing a substitution and a *fidei commissum* reprobated by law.

They further aver that if the said contract was binding in law, the same does not entitle the plaintiff to the relief claimed by her, nor to any relief, except to claim the interest stipulated, etc., etc., etc., after obtaining a judgment of separation of property, and showing that the contingences contemplated in the said instrument (the deed of guaranty) have occurred.

What is the true character of the instrument sued on, and called by the plaintiff's counsel "an act of guaranty?" Here is the opinion of the district judge upon it: he says, "This instrument is the most extraordinary one which it has ever been my fortune to see. If it had been drawn up with the express intention of presenting a puzzle to the tribunals, its author could not have succeeded better." Such incongruities are a very common result, when contracts which are to be executed in civil law countries are drawn up, as this was, by common law lawyers. The ruling idea of this act is the appointment of a trustee, who is to stand forever between the husband and wife. Such trusts are contrary to the policy of our law, and are reputed as not written. The act in question evidences a donation by a father to his married daughter and her children, coupled with provisions to secure the gift to the donee beyond contingencies. Precisely such a case was before this court in 1857; *Partee, Trustee, etc.*, v. *The Succession of H. R. W. Hill*, 12 An. 767. In that case H. R. W. Hill had bequeathed to his niece $40,000, and appointed trustees to invest the same, and pay her annually the interest. The court said, "it is clear the bequest was to Mary R. Todd, wife of Sterling H. Lester, and her alone. No interest in this legacy was to vest in any one else. If the clause referring to the trustees be considered as mandatory, in other words, as a condition or mode of clogging the title of Mrs.

PECQUET
v.
PECQUET'S EX'R.

Lester, then it is void and must be considered as not written. New titles cannot be invented by testators. Absolute ownership bequeathed to a specific person cannot be crippled by the appointment of supervisors of a class unknown to our laws, who shall, for the period of their lives, keep the owner out of possession against his will, and manage for him what he is capable of managing for himself. *Fidei commissa*, the trusts of the English law cannot be created in Louisiana and enforced in our courts. C. C. 1506, 1507. *Clague's Widow* v. *Clague's Executor*, 13 La. 7; *Harper* v. *Stanborough*, 2 An. 381; *Succession of Franklin*, 7 An. 12. If the clause concerning the trustees be regarded as advisory merely, it need not be expunged from the will. If the legatee had chosen to avail herself of the testator's recommendation, Partee might have sued, for acquiescence would have made him her agent, and he would have derived his powers from her, and not from the mere force of the testator's will."

This is precisely the case before the court. If the appointment of a trustee, required by the act of guaranty was intended to be obligatory, it is contrary to the policy of our and the French law, and "must be considered as not written." If this clause was intended as advisory, it is a recommendation, which imposes no legal obligation on the plaintiff. She may appoint a trustee, but he is simply her agent, who derives no authority from the act of guaranty, and she may, whenever she pleases, change him, or dispense with the assistence of a trustee altogether."

It is thus that this attempted trust was viewed by the District Court. The plaintiff had appointed her father her trustee under the act, by a deed executed at Richmond; but this appointment not having been authorized by her husband, was null and void. In her petition, the plaintiff prays that "her father be recognized and appointed her trustee, to carry out the provisions of the act of guaranty"; but although the plaintiff could certainly have made no more appropriate selection, yet the court ignored this request entirely, and gave judgment in favor of the plaintiff herself for a part of her demand. The court based its decision upon the case in the 12th Annual, above referred to, and very properly considered that it was no part of the functions of the court to select an agent for her in opposition to her husband's wishes, who objects to the appointment of any trustee whatever.

The irreconcilable conflict of the act of guaranty with our laws, is apparent in another aspect. The sum of $27,000 was advanced by the plaintiff's father, expressly "to go into the hands of her husband," and therefore to be used by him in his commercial business.

What was really donated, was a debt contracted by the husband, which he was to return to her or her children, and this return was guaranteed by the husband's father and mother. This donation was made to the plaintiff and her child, and any other children which may be born of her; the annual interest to be paid to her. The plaintiff, according to the intention of the act of guaranty, had only a right to the interest; the principal to be preserved, through the agency of a trustee, for her child or children. That act shows, that at its date, the plaintiff had one child. It is probable that, as far as that child is concerned, this disposition might be allowable under Art. 1509 C. C., which declares "that a dispo-

sition *inter vivos* or *mortis causa*, by which the usufruct is given to one  <span style="float:right">PECQUET</span>
and the naked property to another, is not to be considered as a substitu-  <span style="float:right">*v.*<br>PECQUET'S EX'R.</span>
tion, and shall be valid." But under the decision in *Rachal* v. *Rachal*,
1 Rob. 115, if other children have been or may be born of the plaintiff
since the date of the act of donation and guaranty, it would be held to be
a prohibited substitution. Of this fact, however, the record affords no
evidence. These principles are so familiar and well settled in our juris-
prudence, that an attempt further to illustrate them would be a misuse
of the time of the court.

Again, the act of donation and guaranty directs the appointment of a
trustee, who is to invest and keep the principal debt for the benefit of
the child or children, who have a right to claim it from the trustee only
after their mother's death. This, under the authority of the decision in
*Clague's Widow* v. *Clague's Executor*, 13 La. 7, is a "*fidei commissum* or
trust which the law forbids," and is an infringement of the parental au-
thority of both the father and the mother of the child or children, to
whom the law confides the administration of the property of the children.
C. C. 239. The attempt of putting a trustee over the authority of the
father has never been made in Louisiana, so far as the Reports inform
us, and would not be successful, if made. Nor can such a deed of trust
impair the husband's authority, by compelling him to allow his wife to
choose an agent or trustee without his consent and contrary to his advice.
Nor can courts of justice thus interfere with the husband's rights in this
respect. The courts may authorize the wife to sue; but after she has
obtained judgment, she cannot receive or claim and invest the money
without the husband's consent, nor do through an agent what she cannot
do herself.

The attempted appointment of a trustee, under the act of donation and
guaranty, thus falling to the ground, as well as the unauthorized appoint-
ment by the plaintiff, the inquiry presents itself, whether the authoriza-
tion of the court to bring this suit can supply this defect. Under the
authority of Art. 126 C. C. and 107 C. P., courts generally grant such
authorization upon the most superficial examination, particularly when,
as in this case, the husband is stated to be absent.

But when, upon the introduction of the evidence, it appears that the
husband's refusal to authorize the institution of the suit is firm and per-
sistent, and that the authorization to bring the suit is ineffectual and
nugatory, unless followed up by the husband's consent to the appoint-
ment of a trustee to carry out the judgment, if obtained, or to receive
and invest the amount of the judgment, which consent and authorization
the court cannot give in the place of the husband, then the question arises
whether the court should not abstain from deciding a case in which
its judgment could produce no effect, unless the husband's assent is ob-
tained by extra-judicial means ? *Aikins* v. *Cowand*, 9 An. p. 12.

To relieve herself from this dilemma, the wife must pursue the remedy
pointed out by act 126 of the C. C., and art. 106 of the C. Pr. It is known
that no ground exists in this case for this extreme remedy, and hence it
follows that the prosecution of this suit, contrary to the husband's wishes,
is an impossibility.

This suit is a controversy arising out of family settlements. But, for-

tunately, unlike most of the suits springing from a similar cause, it presents none of the painful features of recrimination and bad feeling, which so often call upon the interference of courts in matters that ought to be hidden from the public eye. The motives of all the parties are respectable. The father-in-law, by whose guidance the daughter naturally is governed, acts from prudential motives for the welfare of his child and her offspring; the husband from motives highly honorable, in disregard of the immediate advantage of himself and his wife, and child and children.

The truth of these assertions depends upon the evidence in the record, which will also determine whether our objection to the institution of this suit, on account of the husband's dissent, is well founded. It is difficult to separate the examination of this question from that of various questions arising on the merits of the case, if this exception should be overruled. We shall therefore enter upon the examination of the merits of the case, with a request that the court will also notice the bearing of the evidence upon the exception we have taken to the insufficiency of the authority to institute this suit.

The guaranty of Louis Joseph Pecquet and his wife, the father and mother of plaintiff's husband, was to take place only upon the death of her husband, or in the event of his failure in business, or becoming bankrupt, so that she and her said child and children shall no longer receive, at his hands, a support necessary to her condition in life. On this subject we find two kinds of evidence in the record. The first is evidence of a doubtful character; the second, of a character very unusual, when third persons are to be effected.

To prove the husband's insolvency, the plaintiff examined three witnesses: *Ernest Quertier, Charles Lafitte,* and *Jules Levita,* the latter in Paris, under a commission. The first of these witnesses says that Nemours Pecquet told him, that he had been in business in France, that he had settled all his affairs without going into court, and never failed. The witness understood Nemours to say, that he had never been put into court, and had made an amicable settlement with his creditors. The witness does not know why Nemours Pecquet returned to this country.

This testimony is corroborated by *Lafitte,* who adds nothing to it.

*Levita,* of Paris, was employed by the late John Y. Mason, the minister of the United States in Paris, to make enquiries concerning the business position of Nemours Pecquet, whom he never knew personally. He knows, from reputation, that such a person as Pierre François (alias Nemours Pecquet was, at some time in Paris, engaged in commercial business. From reputation, his credit was good in the commencement; but the witness believes, though he is not certain, that he afterwards went to protest; he became embarrassed, but did not fail. The witness knows no detail of dates. When he was protested, continues this witness, he called his creditors together, without any judicial authority, and the witness heard he had compromised at forty or sixty per cent.; but the witness again knows nothing of the details. He thinks, however, he (Nemours Pecquet) left France on account of his "bad affairs," and that he was embarrassed, but cannot say whether he could have continued in business or not. His credit was of course weakened, but the witness does not

know what his resources were.  On cross-examination, he said that the <span style="float:right">PECQUET<br>*v.*<br>PECQUET'S EX'R.</span> facts testified to were derived from others.  It is then merely hearsay evidence.  Rocheford says that Nemours Pecquet is now a cotton broker in New Orleans, in partnership with Peuch, which is a branch of business not requiring much capital; that he lives in furnished lodgings, and takes his meals at a restaurant.

The deposition of Levita, which was taken in France, was objected to by the defendants, and an entry on the minutes shows that the court was to pass on what was hearsay testimony.  Now the whole of Levita's deposition is evidently hearsay.

The deposition of Quertier, Lafitte and Rotchford were taken by consent, and a further entry on the minutes says that "the court will pass upon the admissibility of this evidence, as objected to by the defendants, as being hearsay evidence, and as being declarations of a husband in favor of his wife, and the right of either party to except is reserved."  The court did not decide on the admissibility of the evidence during the trial, but took the case under advisement, and decided it with reliance upon this evidence, thus impliedly admitting it.  After a judgment on the merits, there was no opportunity for taking a bill of exceptions, nor was there any necessity for it, for the objections are specifically stated in the entry on the minutes.

But if all the testimony hitherto spoken of was clearly admissible, what would it amount to ?  Does it prove, in the words of the act of guaranty, "that the plaintiff's husband has failed in business, so that she and her said child or children can no longer receive at his hands a support necessary to her condition in life ?"  And this is the proposition which the plaintiff has to establish affirmatively, before the responsibility of her father or mother-in-law attaches; this is the condition of the bond.  The failure of a business man is a substantive fact very easily established by those who had business transactions with him at the domicil of his establishment.  Embarrassed traders always have creditors, and generally numerous creditors, who have a personal knowledge of the circumstances of their debtor, and the settlements they have made with him.  Instead of procuring such direct testimony, if in existence, the plaintiff has relied upon the declarations of her husband to Messrs. Quertier and Lafitte, and upon the loose information collected by Levita in Paris; and all these witnesses say that Nemours Pecquet had not failed : and so the condition of the bond is not broken and this suit must fall to the ground.  The bond contemplated a total failure, which would incapacitate the husband from supporting his wife and child or children.  There has not been even an attempt to show such incapacity.  Nothing in the record shows that the family suffered from want, or whence their means of support were derived.  That the husband exchanged his French business for another kind of commercial business in his native country may lead to the supposition that he did not find his former business as profitable as the new busines in which he has engaged since the institution of this suit, but is certainly no evidence of that utter inability to support his family, which is the contingency upon which the responsibility of his parent attaches.  The District court seemed to consider the character of that business a proof of his discomfiture.

28

PECQUET      A court sitting in this city, where so many fortunes have been made in
PECQUET'S EX'R. the cotton brokerage, will certainly not listen to the assertion that, if a
*v.* man is a cotton broker, it is a proof that he cannot support a small
family.

But the above mentioned is not the only evidence upon which the plain-
tiff relies. Her counsel have introduced two letters from Nemours Pec-
quet to the plaintiff's father: one of the 21st July, 1858, the other the 11th
May, 1859, and a letter from Paul Pecquet to the same gentleman, of the
25th October, 1858. Paul Pecquet is the brother of Nemours Pecquet,
and his wife is the sister of the plaintiff. An entry made by the clerk
during the trial shows that these letters "were offered by the plaintiff,
but not filed, and objected to by defendants, on the ground that they are
declarations of a son against his mother, the declarations of a husband in
favor of his wife; that the letter of Paul Pecquet is hearsay. The right of
either party to a bill of exceptions was reserved by the court, and the
court was to pass upon the admissibility of the evidence."

We find in the record that these letters were filed on the 8th March,
1860, the day of the trial of the case, " *nunc pro tunc*," which, we presume,
must be understood to mean that the judge, when making out the judg-
ment, considered them as proper evidence, and delivered them to the
clerk together with the judgment. It would have been irregular to have
prepared bills of exception after judgment, nor was there any necessity
for it, as the specific objection to the reception of these letters was already
spread on the record.

It is obvious that, as husband and wife cannot be witnesses for or against
one another (C. C. 2260), the husband's declarations, whether verbal or
written, cannot be received for or against her. It must be supposed that
those letters were, by the plaintiff's counsel, considered good evidence in
her favor, for otherwise they would not have offered them; and for this
very reason they should be rejected.

As, however, these letters are the principal basis of the judgment of
the district court, we shall examine their contents as if they had been
made evidence by consent of parties.

On the 21st July, 1858, Nemours Pecquet writes to his father-in-law :

"I am completely ruined by the last commercial crisis. From all ap-
pearances, I shall have nothing from my father, and I never will consent
to ask my family to pay 7,500 francs income, for I should consider that
indelicate. What I can do without injuring any one is what I stated in
my last letter. By annulling your act you relieve my family from an
enormous charge; but, at the same time, I shall ask my mother to give
me $10,000, not on account of the actual (the father's) succession, but on
account of what I may inherit from my mother; for, with these $10,000, I
could buy a charge de courtier de change, which will enable me to sup-
port my family and to pay interest to my mother, if required. I hope
you will consent to send me the act. My position is very disagreeable.
The little that is left me is going every day. None of my family know
my position, and I beg you not to say anything about me to any one."

This is the substance of the letter, nearly in the writer's own words.
This letter seems to have been written from Paris.

The next letter in date is that written by Paul Pecquet to Moncure,

who, as has been stated, is the father-in-law of both Nemours and Paul <span style="float:right">PECQUET<br>*v.*<br>PECQUET's EX'R.</span>
Pecquet. It is dated Paris, October 25, 1858. This letter begins thus:
"Great was my surprise when I received Nemours' call, a few days ago,
for the purpose of ascertaining the validity of my parent's guaranty.
Very great was my astonishment, for this was the first intimation of his
distress : for the first time I heard that he was ruined and broken. I made
inquiries of him, the result of which I shall proceed to communicate to
you : It seems that, for years past, both Nemours and Kate were aware
of the impossibility of carrying on their business successfully, and that,
for the avowed and sole purpose of keeping the truth from my father,
they calmly sank dollar after dollar, until the last was gone beyond re-
demption, knowing well the result of such a course would be finally to
charge the estate with reimbursement of $25,000 by you advanced. The
only excuse given by Nemours for this act of folly is, that the knowledge
of such a fact brought home to my father would instantly have killed
him. This conduct I will not pretend to qualify; but, this much I will
say, his feelings and sentiments upon the subject have placed him in this
cruel dilemma, either to kill his father or wrong his co-heirs. He has
chosen the latter alternative, which might have been avoided in a mea-
sure if he had consulted with us; had Kate mentioned the fact to her sis-
ter; had she given you a hint at the time you were here, something might
have been done to have saved what remained from destruction. I say
they took upon themselves this responsibility, and, having acted thus,
with a full knowledge of the consequences, it may be they should support
them alone.   *   *   *   I wish to place the blame where it attaches,
and dispel all idea of complicity on the part of my father. He died with-
out the slightest suspicion of the reality."

Paul Pecquet then gives his opinion of the legal character and inherent
defects of the act of guaranty, and proceeds to say : This case presents
this very strange feature, *i. e.*, whatever is done to enforce the act for the
benefit of Kate and Nemours, will be greatly detrimental to Bettie (the
writer's wife) and myself; for this claim absorbing the assets of the suc-
cession, nothing more to be left for us."

He then speaks of a letter which Kate and Nemours had received from
Moncure, advising them to postpone their departure from France until
April; but adds, that Bettie and himself had advised them to depart
without delay for Brazil—that the "Brazilian Emigration Company," a
most promising enterprise, had tendered him an employment as surveyor
or engineer; that by going there he would be sure of a salary of 20,000 to
30,000 francs, besides what he might earn from private land holders or
from a connection with a contemplated railroad; that Kate is delighted
at the idea of living in a warm climate; that it would be necessary for
Nemours to spend some time in Washington City, to study the American
land system; and that, in order that he might go to work at once, they
had determined to leave France on the 16th of the next month. He
finally says that he has read this letter to Nemours and Kate, who ad-
mitted the truth of all his assertions. Then follows another letter,
probably on the same sheet of paper, evidently written by Mme. Paul
Pecquet (Bettie Moncure), corroborating her husband's statements.

The last letter is one from Nemours Pecquet to Moncure, dated Rich-

PECQUET
v.
PECQUET'S EX'R.

mond, May 11th, 1859. He says: "Mr. Dunlop has just advised me of the deed which is to give you a power in my wife's place to sue my family for money advanced me. Unfortunately you require my signature. This puts me in a very false position. If I were to give my signature, I am sure I should be considered by all my family for the rest of my life as an infamous wretch; for in doing so, I rob them of what belongs to them. On the other hand, if I refuse to give it, you have a right to heap on me the bitterest reproaches, for having put your daughter in the awful position." He then explains why he came to this country (Virginia) He hoped that through the high standing and influence of his father-in-law, he would find employment. But in this case he was disappointed. He kept his bad circumstances concealed, and people believing him rich, would not offer him an inferior employment. He assures M. that he is ready and willing to undertake any honest work to support his family; to do every thing in his power to sustain his family; to put his *amour propre* aside; but he adds, "be convinced, that I would rather support the hardest privations, than live on such an income. He hopes that M. will have no unkind feelings towards him for refusing to co-operate with him in this suit.

This correspondence discloses the distress of mind of a man who, unsuccessful in his commercial business, has lost everything except his courage and his honorable feelings. He feels his capacity for useful exertion, and is burning with a desire to enter upon a new career of usefulness. He implores his father-in-law to use his influence and position to procure him any kind of honest employment. He and his wife are willing to expatriate themselves and go to a distant and little known country, because it opens to them the prospect of advantageous employment in his profession of engineer. He assures his father-in-law that if the act of guaranty, which disturbs the peace of his family, is given up, his mother will advance to him, on account of her future succession, a sum of $10,000, with which he can begin life anew, even in France. He is ready to submit to any privation rather than to sanction a suit by his wife against his own family, although by the terms of the act he would immediately participate in the fruits of this suit; he considers such a course as dishonorable and as productive of distress to his father's family, and the cause of irreconcilable dissentions between them. It must be observed that there is not in the evidence the least charge of misconduct or incapacity against Nemours Pecquet. His commercial business evidently proved unprofitable from the incidents inseparable from that class of pursuits. He settled amicably with all his creditors, without the least difficulty. He was not troubled by any of them afterwards, and was eager to begin a new life of usefulness. Many thousands of worthy men in this community have been in similar and worse predicaments, and have afterwards attained wealth and risen to eminence. Such men, in the full vigor of their faculties, impelled by affection for their families, and chastened by experience, cannot be considered, in a country like this, and in the words of the act of guaranty, "unable to afford a support to their families." A capital yielding an annual interest of $1,620, is a much inferior guaranty for the support of a family, than the character and disposition evinced by Nemours Pecquet in these transactions.

But the father-in-law evidently had less confidence in Nemours's prospects than he had himself, and this suit was brought.

These considerations are applicable only if the above mentioned three letters are held to be legal evidence, which it is difficult to maintain. If they are rejected, the plaintiff's case is without evidence, and must entirely fail.

But if these letters are admitted as evidence, and the court should be of opinion that the facts disclosed in them establish the existence of the contingencies under which the responsibility of Louis Joseph Pecquet's estate and his widow, under the act of guaranty, attaches, then the whole contents of these letters must be taken as true (19 La. 482). And the next question would be, what is the extent of the liability of the deceased parent, and what the liability of the surviving parent? The District court assumed that the death of the father authorized the plaintiff to claim at once half of the sum guaranteed from his estate; but that the surviving mother had a right to postpone the payment of her half of the sum guaranteed during her life time, on the annual payment of interest at six per cent. But the District court evidently overlooked an important part of the act of guaranty, which is in these words, viz:

"But the said Louis Joseph Pecquet and Marie reserve the right, if either contingency above mentioned (that is, the death or bankruptcy of Nemours Pecquet) shall occur during their joint lives; that so long as he or she shall live, they may be permitted to pay six per cent. interest on the said sum of $27,000, annually, for the purposes aforesaid, instead of paying the principal sum. And at the death of both of them, the said sum shall be in money or property of equivalent value be paid or conveyed to the said Catharine's trustee for the purposes aforesaid."

Now it was the obvious duty of the obligees in the bond to show affirmatively the date of the event which authorized her claim to the principal instead of the interest, viz: that the failure of her husband occurred after the death of his father. The petition states that the father died on the 19th of September, 1857; and the letter of Paul Pecquet, of October 25, 1858, which is evidence in all its parts, unless all the letters are rejected, and which was read to both the plaintiff and her husband, and then admitted by them to state the truth, declares positively "that for years past, both Nemours and Kate (the plaintiff) were aware of the impossibility of carrying on their business successfully, and that for the avowed and sole purpose of keeping the truth from my (the writer's) father, they calmly sank dollar after dollar until the last was gone beyond redemption. * * * The only excuse given by Nemours for this act of folly is, that the knowledge of such a fact brought home to my father would instantly have killed him." He adds, that his father died without knowing anything of Nemours' distressing condition.

For the reasons stated in this view of the case, the defendants submit that the plaintiff's petition should be dismissed, or, at least, that if judgment should be given in her favor upon the bond of guaranty, it should be restricted to the annual payment of six per cent. interest upon $27,000, one-half to be borne by the estate of Louis Joseph Pecquet, and the other half by his widow.

PECQUET
v.
PECQUET's Ex'r.

I. The instrument sued on is, according to plaintiff, a donation *inter vivos*. If so, it is null and void: 1. As not being evidenced by a notarial act. C. C. 1523, 1525; *Barrière* v. *Gladding's Curator*, 17 La. 146; *Miller* v. *Andrus*, 1 An. 237. 2 As not being accepted by the plaintiff with her husband's authorization. C. C. 1532. 3. As containing a *fidei commissum* in favor of a trustee and a substitution in favor of plaintiff's children, born and unborn, which are provisions or conditions contrary to, and reprobated by, the policy of our law. C. C. 1506, 1507.

It is true that impossible conditions are reputed not written in donation *inter vivos* and *mortis causa*. C. C. 1506. But this rule applies only to impossible conditions generally, and not to those which are specially pointed out by law as vitiating the gift itself. Thus, in Art. C. C. 1507, we see "that substitution and *fidei commissa* are prohibited, and that the disposition itself is null and void." Hence the inference appears to us irresistible that a *fidei commissum*, or trust, vitiates a donation or a will as well as a substitution; and that in deciding that *fidei commissa* were merely to be reputed not written, the courts, with due respect and deference, have mistaken and misapplied the law.

We are told that the substitution in favor of children and grandchildren is binding under the French law, which must govern the parties in this case, France being the *lex loci contractus*. To this we answer, 1. That the provisions of the French law, on this head (Arts. 1048 to 1074 Napoleon Code), are not to be found in our own Code, having been left out of it *ex industria*; and that provisions contrary to the policy of our law cannot be enforced here. C. C. 1507. *Penny* v. *Christmas*, 7 Rob. 482; *Harper* v. *Stambrough*, 2 An. 377; *Lee* v. *His Creditors*, 2 An. 599. 1. Fœlix, Droit international privé, p. 216, No. 99. 2. That as to the appointment of a trustee, which is a *fidei commissum*, so called in the very instrument sued on, it vitiates the gift as contrary to law and public policy, and as being in derogation of the marital power. *Vaughan* v. *Christine*, 3 An. 329; and, 3. That the other radical defects, above pointed out, stamp the instrument with an indelible mark of nullity.

Again, we are told that the usufruct may be given to one, and the naked property to another. Granted; but the text of the instrument sued on resists to this interpretation given to it by plaintiff. Could the property be given to unborn children? Clearly not. C. C. 1469.

Besides, if the French law were to govern this case, the instrument, being made under private signature, should be void, because not signed by Moncure, and because not made in duplicate original. Nap. Code Art. 1325.

II. But the instrument sued on is not a donation. C. C. 1454. In fact, Moncure paid money to his son-in-law unconditionally, for the first sum of $13,500 and for the second sum of $13,500 gave, or authorized to draw a draft on his house, on the condition that the father and mother of his said son-in-law would secure to his daughter and grandchildren, born and unborn, in certain contingencies, certain advantages specified in said instrument. What is it then? We think that it is a contract *sui generis, do ut des*. At all events, it is a contract, and not a donation; and the conditions to pay to a trustee who is himself directed to invest the funds and serve the interest thereof to the wife (the plaintiff) and then,

after her death, to her children, born and unborn, are clearly impossible conditions contrary to law, and which vitiate the contract itself, as well in France as here. Napoleon Code 1172; La. Code 2026. Larombière, whose recent work on Obligations stands very high, commenting on this Art. 1172, says: "Toute condition d'une chose contraire aux bonnes mœurs, à l'ordre public, ou prohibée par la loi, rend également nulle la convention à laquelle elle est apposée." 2 Larombière, Obligations, p. 33; 1 Poujol, Obligations, p. 379 et suiv.; 6 Touillier, No 479 et suiv.

Our Art. 2026 reads thus: "Every condition of a thing impossible or *contra bonos mores* (repugnant to moral conduct) or prohibited by law, is null, and renders void the agreement which depends on it." And Story, Equity Jurisprudence, vol. 2, p. 731, No. 1303, says: "In regard to contracts, if they stipulate to do anything against law, or against the policy of the law, they are treated, at the common law, as void."

So that, in whatever light the instrument sued on be considered, and whether it be called a donation, a suretyship, a warranty, or any other kind of contract, it is an absolute nullity and cannot produce any effect.

And supposing, for the sake of the argument, the instrument to be binding, and supposing all the exceptions and defences, heretofore presented, unavailing, still, the present action should be dismissed, if we are not mistaken, for this reason, that by the *lex loci contractus*, invoked by the plaintiff, the sums received by the husband from his father-in-law fall into the community. Nap. Code, 1401; and, consequently, the husband alone would have the right to sue; so that this suit, instituted by the wife for a debt due to the community, if due at all, is an absolute nullity, and should be dismissed. Nap. C. 1421; La. C. 2373.

To sum up, and in addition to the conclusions of our original brief:

1. The instrument sued on is an absolute nullity, and cannot give any cause of action.

2. Supposing, for argument sake, the instrument to be binding, the sum stipulated therein cannot be claimed, in whole or in part, until both L. J. Pecquet and his wife are dead.

3. According to the *lex loci contractus*, invoked by plaintiff, the debt, if there be any in contemplation of law, which is denied, should be due to the community, and as such, could only be' sued for by the husband. C. C. 2373; N. C. 1421.

4. The hearsay evidence, the declarations of the husband in favor of his wife and of the son against his mother, being left out, as they should be, the plaintiff has not made out her case, supposing that she had any right of action.

5. There is no solidarity in the pretended obligation, and the solidarity cannot be presumed. C. C. 2088. The quotation of plaintiff from 3 Troplong, Mariage, §§ 1771 to 1774, are based on Art. 1484 of the N. C. which is not to be found in our law; and, therefore, have no application. Besides, supposing that doctrine to be correct, which is denied, the plaintiff would have waived her right by suing both the succession of L. J. Pecquet and his surviving wife jointly, instead of suing the succession for the whole.

PECQUET
PECQUET s Ex'r.

ILSLEY, J.   The present suit was instituted in the Second District Court of New Orleans, and grows out of the instrument which is herein tran-scribed from the record :

"Whereas, a marriage was consummated in the year 1852, between Nemours Pecquet, late of New Orleans, in the United States, and Catherine Ambler Moncure, daughter of Henry W. Moncure, of the city of Richmond, in the State of Virginia, in the said United States of America, of which marriage a daughter named Louise has been born, and on the celebration of the said marriage no marriage agreement or settle-ment was entered into.

And whereas, since the said marriage, the said Henry W. Moncure, father of the said Catherine, has paid and advanced to his said daughter the sum of thirteen thousand five hundred dollars, which sum has gone into the hands of the said Nemours, her husband.

And whereas, the said Henry W. Moncure is willing to advance the further sum of thirteen thousand five hundred dollars on the draft of the said Catherine, and in like manner to go into the hands of her said hus-band, but on the condition and with the express understanding that a guaranty shall be given, so as effectually to secure the said Catherine Pecquet and her said child, and any other children which may be born of her, to be realized and made available for her use, so that the annual in-terests on this said sum of twenty-seven thousand dollars shall be annually paid to her, through the agency of a trustee, on the death of her said hus-band, or in the event of his failure in business, so that she and her said child or children shall no longer receive at his hands a support necessary to her condition in life.

And whereas, in consideration of the sums already advanced, and of the further sum of thirteen thousand five hundred dollars to be paid and ad-vanced by the said Moncure as aforesaid, Louis Joseph Pecquet and Marie, his wife, now resident in Paris, in France, father and mother of the said Nemours, have agreed, and do by these presents agree and cove-nant with the said Catherine Ambler Pecquet and Louise, her child, and such other children as may be born of her, the said Catherine, that, in the event of the death of the said Nemours Pecquet, or in case of his fail-ure in business or becoming bankrupt, they, the said Louis Joseph Pec-quet and Marie, his wife, will and do hereby guaranty the said sum of twenty-seven thousand dollars, to be paid to a trustee to be nominated by her, the said Catherine, and by him to be invested, and the annual inter--est of which is to be paid for the necessary support of her and her said children; her said husband, if alive, to participate thereof; but the said Louis Joseph Pecquet and Marie reserve the right, if either contingency above mentioned shall occur during their joint lives, that, so long as he or she live, they may be permitted to pay six per cent. interest on the said sum of twenty-seven thousand dollars, annually, for the purposes afore-said, instead of paying the principal sum, and at the death of both of them the said sum, in money or property of equivalent value, shall be paid or conveyed to the said Catherine's trustee, for the purposes afore-said.   And it is further understood and agreed, that this guarantee shall cease to have any legal force and effect, if, at any time during his life or by his testamentary dispositions at his death, the said Nemours shall have,

by due and legal settlement, conveyed the said sum of twenty-seven thousand dollars to a trustee, for the use and benefit of the said Catherine and her child or children, in available funds, he not having failed in business during his life."

Mrs. Catherine Ambler Pecquet, wife of Nemours Pecquet, duly authorized to institute and maintain her action, claims from the (concillary) succession of her father-in-law, Louis Joseph Pecquet, opened in New Orleans, and from Mrs. Marie Pecquet, his widow, represented by her agent and attorney in fact, *in solido*, the whole sum of twenty-seven thousand dollars, with interest at the rate of six per cent. per annum, from the 1st day of October, 1858, averring that the obligation assumed by the defendants has become absolute, by the happening of one of the events or contingencies in the said instrument stipulated, viz: her husband's failure in business or bankruptcy.

She prays that her father, Henry W. Moncure, be recognized and appointed her agent and trustee, to carry out the provisions of the said act of guaranty.

In default of the authorization and assistance of the plaintiff's husband in the prosecution of her claim, notwithstanding due legal personal notice on him to that effect, she was properly authorized by the court to stand in judgment.

See Articles 106, 107, C. P.; 123, 126 C. C.; *Bruy* v. *Bynum*, 2 A. 279; *Villeneuva, Leblanc et al.* v. *Dubuea and wife*, 6 A. 360.

The defendant filed an exception to the effect that the petitioner showed no cause of action, because this action cannot be maintained by the plaintiff before obtaining a separation of property from her husband, and on showing the utter impossibility to recover her matrimonial claims against him after a full discussion of his property.

This exception was properly transferred to and acted upon in the examination of the merits, blended as it is with the vexed and complicated questions which the contract presents.

The separate answer of each of the defendants was substantially the same. It pleaded the general issue, and averred that the written instrument on which the suit was based can have no effect whatever, either under our laws or under the laws of France, the same containing a substitution and *fidei commissum*, reprobated by law, and the stipulation therein contained never having been accepted or executed.

That, even if the said contract was binding in law, the same does not entitle the plaintiff to the remedy claimed by her, nor to any remedy, except to claim the payment of the interest stipulated in the said instrument, after showing that the sum of money therein mentioned has been paid by her father in the manner therein stipulated; and after obtaining a judgment of separation of property from her husband and discussing all his property, and showing that the contingencies stipulated in said instrument have occurred; that she is legally authorized to bring this suit, and that her husband has lost all control on her rights and property. All of which the respondents specially deny.

On the trial of the case in the court below, certain evidence was offered by the plaintiff, very material in its bearing on the result of this controversy. In the note of evidence is the following entry: "Plaintiff also

29

PECQUET          offers testimony taken in France, the court to pass upon what point is
PECQUET's EX'R.  hearsay evidence; also testimony taken by consent, this day now filed.
The court will pass upon the admissibility of the evidence as objected to
by the defendants, as being hearsay evidence, as being declarations of a
husband in favor of his wife, *and the right* of either party to except, is
reserved.

The letters of Nemours Pecquet and one of Paul Pecquet, all offered
by plaintiff, but not filed, and objected to by defendants, on the ground
that they are declarations of a son against his mother; the declarations of
a husband in favor of his wife; that the letter of Paul Pecquet is hear-
say.

The right of either party to a bill of exceptions is reserved by the
court, and the court to pass upon the admissibility of the evidence."

It was upon this testimony alone that the happening of the event,
which was to fix the liability of the defendants, was shown, if the con-
tract was legally a valid one; and the court below received the evidence
without expressing any opinion as to its legality, but thus tacitly over-
ruled the objections to it.

The only mode pointed out by law to test, in this court, the correct-
ness of the opinions of inferior courts, is by bill of exceptions, and none
were taken. C. P. Art. 488; and in no other form can it revise such
opinions.  *Graugnard* v. *Lombard*, 14 An. 234.

It is only when the question decided is presented by the pleadings, that
a bill of exceptions may be dispensed with. *Exchange Bank* v. *York*,
2 A. 139; *Scott* v. *Lawson*, 10 An. 547.

The judge *a quo*, after a very careful examination of the instrument
sued on, and the testimony adduced, condemned the estate of Louis
Joseph Pecquet to pay to the plaintiff the sum of thirteen thousand five
hundred dollars, with interest, at the rate of six per cent. per annum,
from judicial demand, 7th June, 1859; and also condemned Marie Pec-
quet, his widow, to pay to the said plaintiff a like sum of thirteen thou-
sand five hundred dollars, with like interest.

This last judgment against Marie Pecquet to be executory only, if she
fails to pay an annual interest of six per cent.; the costs of suit to be paid
by the defendants.

. It is very important, at the outset of the present investigation to de-
termine whether the contract sued on, having been entered into in
France, should be decided here by the laws of that country, although
those laws have not been proved. And this suggests the broad question,
whether the laws of France can be noticed by our courts without proof?

No principle is better established on the subject of the conflict of laws
than this : that the laws of the place of the contract are those which
govern it, unless such laws are expressly excluded, or the performance of
the obligations growing out of it is to take place in some other country,
where different regulations prevail.

It is a general rule of evidence that courts cannot notice the laws of a
foreign state, unless they are proved as other facts ; but may not, and do
not, cases sometimes arise, in which this rule should be relaxed ?

The law of evidence being the guide by which the truths of a cause should
be ascertained and determined, any deviation from a well established

rule should never be sanctioned by courts, unless it is manifestly clear <span>PECQUET</span>
that such deviation can be wisely and discreetly made, and will tend to <span>v.</span>
<span>PECQUET s Ex'R.</span>
advance a cause and promote the ends of justice. An exception to a rule
of evidence may seem not warranted by precedent, and were the rule a
part of a system of precise legislation, it would hardly be sanctioned
by law; but where such an exception is practically, on principle, useful
and necessary, it becomes itself a precedent to be used in future cases.

As illustrative of the correctness of this doctrine, we find two cases
reported in 1 Louisiana, *Malpica* v. *McKoun*, p. 254; and *Arage* v. *Carrell*,
p. 532.

In both these cases the law of the place of the contract (Mexico),
which was the Spanish law, had been the prevailing law of Louisiana,
and the court therefore had judicial knowledge of the law of Spain.

The law of Spain was also noticed, without proof, in *Berlechaux* v. *Ber-
lechaux*, reported in 7 La., at page 539, wherein the court observed:
"Now, although the Spanish law has no longer any force in the State of
Louisiana, since the repealing act of 1828, yet having been considered
previously the law of this country, so far as it was not abrogated or
altered by statutory enactments, we may still, without violation of the
rule which requires foreign laws to be proved as facts, assume some
knowledge of it."

Connecting Art. 3521 of our Civil Code with the repealing act of 1828,
it might be inferred therefrom that the Spanish, Roman and French
laws were, and had been previously to the cession of Louisiana to the
United States, indiscriminately and as distinct codes, the law of that
province, and that each of these distinct systems of law had, *proprio
vigore*, remained in force in this State up to the respective dates of the
repealing statutes. If this were true, in point of fact, no reason can be
perceived why the laws of France, like those of Spain, should not be judi-
cially noticed without proof.

Now, it is, we think, a matter of historical notoriety, and a truth hard-
ly susceptible of being controverted, that, when Louisiana was ceded to
the United States, the only code of laws in force in that territory, as the
prevailing system, were the colonial laws of Spain; and those laws con-
tinued in force after the cession, until their repeal in the manner before
stated.

Can this be also said in regard to the laws of France? We think not;
because it is also historically known, that after the delivery of Louisiana
by France to Spain, in 1769, in virtue of the secret treaty of 1763,
O'Reilly, Spanish governor and captain general of Louisiana, introduced
into that province the Spanish code, in all its parts, and thereby repealed
the French laws, which had previously prevailed therein.

It can hardly be supposed that O'Reilly acted without the royal sanc-
tion, as all his official acts seem to have met the king's approval.

In the report of the Council of the Indies to the king of Spain, in 1772,
adverting to O'Reilly's *second* statement, wherein he considered it neces-
sary that the province should be subject to the same laws as the other
Spanish dominions in America, and that all proceedings should be car-
ried on in the *Spanish* language, the council remarked : Your majesty
approved these dispositions of O'Reilly, and the council considering this

as an evidence of the advantages to be derived, admires the measures of the said general, which proves the vastness of his genius and that the establishment proposed by him is so far worthy of being made, that the necessary *cédulas* should be issued to the ministers of Havana and New Orleans, etc. See White's New Recopilacion, vol. 2. p. 462.

We learn from Martin's History of Louisiana, vol. 2, p. 14, that the laws of Spain became the sole guide of the tribunals in their decisions as early as 1769.   And Judge Derbigny, the organ of the court in *Beard* v. *Poydras*, 4 Martin's Reports, p. 368, seems to entertain no doubt in relation to the abrogation by O'Reilly of the French laws.

That the French laws were so entirely rooted out, that no vestiges of their existence, especially of those which harmonized with the habits and feelings of the colonists, and the ancient customs of the colony, can be traced, is hardly to be supposed; the more particularly, as the laws of France and those of Spain had the same origin: that of the law of Rome. But, whatever French laws were retained, it was rather by the tolerance, than with the expressed acquiescence of the Spanish rulers; and what those retained laws were, is not generally known.   How, then, can judicial knowledge of any such retained French laws be assumed by our courts?

True it is, that Louisiana was derived by the United States from France, and not from Spain, which had ceded it to the former in 1800; but in the interim, between the date of the treaty of St. Ildefonso, by which the colony was ceded to France, and its actual delivery by Spain, the latter country continued in the possession of, and retained actual dominion over the ceded territory, and no change was made in the laws thereof, which were the laws of Spain.

The possession of Louisiana, taken by Saussat for France, was only for an instant, and merely for the purpose of delivering it in accordance with the 9th Article of the Treaty of 1800 to the United States.   The repealing, then, by our legislature of all the civil laws, indiscriminately, whether Spanish, Roman or French, which had existed in Louisiana previously to the transfer thereof to the United States, must be understood in the only sense which the legislature intended to attach to it.

So far as the laws of France were permissively auxiliary to those of the then prevailing Spanish law, and so far as the Roman law was adverted to, merely as the seminal and prolific source of the Spanish law, and as a means always used to expound the derivative law by *its own* unerring principles, it can be readily understood why the Spanish, Roman and French laws were all collectively abrogated in the sweeping clauses of the repealing statutes.

As we apprehend the rule, courts only take judicial knowledge of what ought to be generally known in its jurisdiction.

The laws of Spain were judicially noticed, because those laws were known generally to have been the prevailing code of laws in Louisiana, at the time of, previous to, and subsequently to the transfer thereof to the United States; and because those laws, as a system, having been operative in this State until their repeal, have become almost inseparably blended with our jurisprudence.

The laws of France must be proved, because, having been abrogated as

the prevailing general law of the province, many years prior to our acqui-
sition of it, and never thereafter adopted as such, we do not possess, ju-
dicially, the means of knowing what French laws in particular were re-
tained by Spain and handed down to us.

We have been referred to the Articles of the Napoleon Code, but not
proved; and, of course, we cannot notice them, as that Code was never in
force in Louisiana, and, indeed, only became, as a Code, the law of France
after Louisiana had become a territory of the United States.

In the absence of any proof of the laws of France, we have no other al-
ternative than to decide the case arbitrarily, or to determine the rights
and obligations of the contracting parties, and the effect and validity of
the instrument sued on, by our own laws; which are presumed to be the
same as those of France: the *locus contractus*. *Ripka* v. *Pope*, 5 A. 63.
*Harris* v. *Alexander*, 9 Rob. 151.

The instrument declared on, it is strenuously contended by the defen-
dants, is not legally binding on them, for the reasons and on the grounds
set forth in their answers, and pressed in their arguments, which are very
elaborate. The points made, and questions raised, are :

1. That, it being conceded by the plaintiff, that the amount claimed is a
donation *inter vivos*, it is null and void as such, because it is not evidenced
by notarial act, and because it is not accepted by the plaintiff with her
husband's authorization.

2. That, as a donation, it contains a *fidei commissum* in favor of a trustee,
and a substitution in favor of plaintiff's children, born and unborn, which
are provisions or conditions contrary to, and reprobated by, the policy of
the law.

3. That, supposing, for argument's sake, that the instrument being
binding, the principal sum stipulated therein cannot be claimed, in whole
or in part, until both Louis J. Pecquet and Marie, his wife, are dead.

4. That there is no solidarity in the pretended obligation, and that soli-
darity cannot be presumed.

5. Whether the condition has happened on which the contract became
executory ?

6. From what date does interest run ?

We will proceed to examine these grounds and questions in the order
in which they are presented :

1. If the advances made by Henry W. Moncure to his daughter,
Catherine, are donations, are they, as donations, nullities for the reasons
given ?

It is not questioned that the two several sums of thirteen thousand five
hundred dollars have been actually received by Catherine Pecquet, and
that they have both gone into the hands of her husband.

Were these sums abandoned by Moncure to his daughter by gratuitous
title, as pure gifts, or were they loans of money made to her, for which
she would be liable as a debtor to him, or to his succession ?

From all the circumstances and facts of the case, as set forth in the
instrument, we have no hesitation in concluding that both amounts de-
livered to Catherine Pecquet were intended to be, and were, pure gifts,
made to her by her father, in advance of her share of his succession, and
that they would have been subject to collation, unless she renounced his

PECQUET
v.
PECQUET'S Ex'R.

succession ; in which event she might retain them.  It was not a debt for which she would be liable, whether she accepted or renounced her father's succession.

We view these advances as executed donations which needed no authentic act to prove them, nor any acceptation in express terms.  See Art. 1528 C. C.  And as was held by the court in *Chachéré* v. *Dumartrait*, 2 L. R. p. 41, they vested in the wife a legal title.

There is great similitude between the material facts of the case just cited and the one at bar, as appears by the subjoined statement or extract from the decision referred to :

"The donation," says the court, "seems to have been made in the following manner : Chachéré, the father, was the owner of certain tracts of land, of which he permitted the husband of his daughter to take possession and occupy for some time, who afterwards sold this property to one Johnson for $1,600, which was paid (on Chachéré's ratification and confirmation of the sale) to his son-in-law."

From the whole tenor of the evidence, we do not doubt the intention of the father to give these tracts of land to his daughter, as a marriage portion ; but before any legal transfer could be made to that effect, her husband was permitted to make the sale as above stated.

The price, although paid to him by the vendee, must be considered as due to the owner of the property, Chachéré, the father, and was left in the possession of the receiver as a donation to his wife ; he received it as her agent, delivered from her father through the agency of the vendee of the land, who was really a purchaser from Chachéré, though nominally from Martel.

The donation was thus fully and completely effected.  It was as fully executed as if the money had been delivered from the father to his daughter, and by the latter delivered to the husband.

If it was of movable or personal property and was executed, it was good according to law.  C. Code 1528.

This is a case in point, and seems to us conclusive.  Moncure intended to donate to his daughter in advance of her inheritance in his estate, and did so donate to Catherine, his daughter, the whole sum of twenty-seven thousand dollars, which went into her husband's hands ; and no better evidence of Nemours' consent to his wife's acceptance of the donation than that, if any such consent was needed, can be well conceived.

2. Does the donation to Catherine Pecquet contain a substitution and *fidei commissum?*

The District judge who tried the case did not view the advances made by Moncure in the light of donations or gifts; and, therefore, deemed Article 1507 of the Civil Code inapplicable.

We concur with the learned judge in his opinion, that this Article of the Code has no application whatever to the subject matter of the present controversy; not because it is not a donation, but simply because the dispositions of the donation do not fall within its provisions.

What disposition is there in the instrument that presents the appearance of, or the resemblance to, a substitution and *fidei commissum?*

No one is mentioned in the instrument in whom the legal title to the fund donated is vested for the benefit of another.  Nor is there anything

therein which charges the donee to keep the thing *for* and to return it *to*    PECQUET
another; and these are the tests of nullity prescribed by Article 1507 C. C.  PECQUET'S EX'R.

Marcadé, commenting on Article 896 of the Napoleon Code, vol. 3, p. 368, § 111, examines very carefully into the nature of a substitution, and terms it, "la clause par laquelle un donateur ou testateur impose à celui qu'il gratifie, la charge de conserver la chose donnée jusqu'à son décès, pour la transmettre alors à une ou plusieurs personnes que le disposant gratifie ainsi en second ordre. Ainsi, il faut, pour qu'il y ait substitution, que le bénéficiaire soit vraiment *obligé* par l'acte, 1o. de *conserver* la chose donnée, et 2o. de la conserver *jusqu'à sa mort*, 3o. pour *la rendre* à une personne désignée."

We look in vain in the instrument for these essential concomitants of a prohibited substitution; nor can we perceive in it any of those inconveniences or evils which have always been a reproach to substitutions.

Money was the thing donated, and it was contemplated that it should be used by the donee or her agent, so as to produce an annual revenue. The donee was not to preserve it; nor would she, even as a trustee, have been bound to keep each identical dollar, and to return that to her children or to her father's estate.

It was well said, in the case of *Groves* v. *McNutt*, 13 A. pp. 122-3, "If that is a *fidei commissum*, or a prohibited substitution, then the thing which the depositary receives and promises to preserve and return to the depositor, or the sum of money which my friend receives from me, and promises to return in one or ten years, are *fidei commissa* and substitutions.

See 5 Toul. No. 24; 3 Marcadé 460; Zacharie, part 2, book 2, section 694.

Marcadé, vol. 3, p. 368, § 460, treating of this subject says, "Il est clair que quand on reçoit une chose à charge d'en rendre une autre, il n'y a plus obligation de *conserver* la chose reçue.

Il suit de là qu'il ne peut pas y avoir substitution quand la libéralité a pour objet des choses fongibles, en sorte que le donataire ait la libre disposition de ces choses, et soit seulement chargé d'en rendre d'autres de même nature, qualité et quantité; dans ce cas, en effet, il n'y a pas obligation de conserver."

Let us examine the facts of the case:

Moncure advanced and delivered to Catherine, his daughter, unconditionally, thirteen thousand five hundred dollars, and subsequently advanced her, conditionally, a similar amount, and the whole amount passed into the hands of her husband; and this total fund was, by the very terms of the instrument, to be realized and made available for *her* use: so that the whole sum of twenty-seven thousand dollars advanced, should, through the instrumentality of an agent (improperly styled a trustee), to be selected by *herself*, be invested or placed at interest, upon the happening of one of two events, in order that she and her family, her children and her husband, might be assured in a becoming manner of the means of subsistence, should her husband become unable to provide them.

Is will be observed that no designated trustee was named by Moncure himself; nor was the title to the fund *vested* in any one, to be named by his daughter, for the object and purposes expressed in the instrument.

In the case of *Franklin's Succession*, 7 A. 421, there was a trust estate,

which presented an evident substitution ; whilst, in this, the ownership of the thing donated, was vested in the donee, Catherine Pecquet.

It was not the intention of Moncure that a trustee, or *fidei commissaire*, should be thrust forever between Mrs. Catherine Pecquet and her husband.

The appointment of a trustee by Catherine Pecquet was merely an advisory measure, which, at her option, she was free to regard or disregard. Any one so appointed by her would have been her agent, deriving his authority from her, and not from the mere force of the instrument.

See *W. B. Partee, &c.* v. *The Succession of H. R. W. Hill*, 12 A. p. 767.

Mrs. Catherine Pecquet, under the dispositions of the instrument, is capable of standing herself in court and asserting her legal rights, and she is the plaintiff in this suit.

3. Can the principal sum stipulated in the instrument be claimed in whole or in part, until both Louis J. Pecquet and Marie, his wife, are dead ?

By an express clause in the contract, it was understood and agreed that, so long as he or she, L. J. Pecquet and wife, live, they may be permitted to pay six per cent. interest on the said sum of twenty-seven thousand dollars, annually, for the purposes aforesaid, instead of paying the principal sum; and, at the death of both of them, the said sum in money, or property in equivalent value, shall be paid or conveyed to the said Catherine's trustee, for the purpose aforesaid.

It is evident that the *term* given for the performance of the obligation, to wit : the payment of twenty-seven thousand dollars, or its equivalent, consisted of an event in the course of nature certain, to wit : the death of both Louis J. Pecquet and Marie, his wife.　See Art. 2044 C. C.

The plaintiff, however, claimed from defendants, *in solido*, the whole amount, principal and interest, but in their answers, the defendants aver that, if they are legally bound at all, the plaintiff's claim must need be restricted to the stipulated interest.

"The complaint of the defendants," as was said by Judge Martin in the case of *Benedict* v. *Williams*, 4 Rob. 392, "is that the present suit places them prematurely in the situation in which the plaintiff might fairly have placed them thereafter ; in other words, that the suit is premature.　This circumstance afforded them a *dilatory exception*, which might have been successfully urged in *limine litis*, but which cannot avail them after a judgment by default."

We can see no difference in principle between that case and the present one, on the question of practice now involved.

The defendants, in the case referred to, resisted the plaintiff's claim, on the allegation in their *answer* that the right of action thereon had not yet accrued, of which fact, proof was adduced on the trial, and this is the defence in that point, set up in the *answer*, and patent in this case.

It was considered by Judge Martin a dilatory exception, in the case of *Benedict* v. *Williams*, to be only urged in *limine litis*, and we deem that ruling as conclusive in this case.　See *Noble* v. *Martin*, 7 N. S. 284 ; *Howard* v. *Steamboat Columbia*, 1 La. 420 ; and also the act of 20th March, 1839, amending the Code of Practice ; which provides, that hereafter no dilatory exception shall be allowed in an answer in any cause.　If, in

some cases the application of this law seems to operate perniciously, it is still a rule of practice and cannot be disregarded. *Dura lex scripta tamon.*

4. Is the obligation contracted by Louis J. Pecquet and Marie, his wife, a joint one, or one *in solido?*

The judge *a quo* who tried the case, considered the obligation a joint one. By Article 2088 C. C., solidarity is not presumed, it must be expressly stipulated; and this rule ceases to prevail only in cases where an obligation *in solido* takes place by virtue of some provision of law, "ou la solidarité a lieu de plein droit en vertu d'une disposition de la loi." We must, therefore, first ascertain what is the nature of the obligation contracted by Louis J. Pecquet and Marie, his wife. The instrument sued on is executed by them alone, and purports on its face to be an acceptance, on their part, of a proposition or offer made to them by Henry W. Moncure to pay and advance to his daughter Catherine, an additional sum of thirteen thousand five hundred dollars, to go into her husband, their son's hands; provided they would obligate themselves, in the manner in which they did obligate themselves, in the instrument, in which there was a stipulation in favor of Catherine and for the benefit of her children. This stipulation was a valid consideration for the contract; and as Catherine, by instituting this suit, has consented to avail herself of it, it cannot be revoked. See Articles 1884, 1896 C. C.; Article 35 C. P.; *Watt* v. *Rue,* 1 An. 280; *Twitchell* v. *Andry and Wife,* 6 Rob. 410; *Andrews* v. *Williams,* 4 La. 238.

Was the obligation of L. J. Pecquet and wife a principal obligation, or an accessory one—one of suretyship?

The act or instrument has all the features of a suretyship, and satisfies the essential conditions of that species of contract, in which three persons must figure, viz: a debtor, a creditor and a surety. The principal obligor is Nemours Pecquet, who is accountable for his wife's paraphernal property, which she can legally claim from him by suit, whenever her claim is exigible. Arts. 2360, 2361, 2364, 2368 C. C.; 8 Martin's N. S. 229; *Hawes* v. *Bryan,* 10 La. 136; *Rowley* v. *Rowley,* 19 La. 572. The creditor is Catherine, the wife of Nemours; and the sureties are the defendants in this suit.

Art. 3004 defines a suretyship an accessory promise, by which a person binds himself for a person *already bound.* It was not important that the principal obligation should have preceded the accessory promise. "Non seulement, says Duranton, le cautionnement peut suivre ou accompagner l'obligation principale, mais il peut même être donné avant cette obligation, en ce sens toutefois qu'il est conditionnel qu'il existera si l'obligation elle-même vient à exister." *Fidi jussor et præcedere obligationem et sequi.* ? 3 Instit., *de Fidi jussoribus.*

The obligation assumed by Louis J. Pecquet and wife was that, in the event of their son's failure in business, and his inability to refund to his wife the whole sum of twenty-seven thousand dollars, her paraphernal property, thus received by him, they became sureties for its reimbursement.

Had they not assumed this liability, Moncure would certainly not have advanced the second sum of thirteen thousand five hundred dollars.

It was natural, just and reasonable, that the father and mother of Nemours Pecquet should obligate themselves thus for their son. It was laid down as a rule by the Christian Emperors, that no security could be taken in behalf of a husband for the restitution of his wife's separate estate, unless the father and the mother of the husband contracted such an obligation. Domat, book 4, tit. 9, § 9. And certainly, under our law, such a contract is a valid one, and no legal impediment stands in the way of Mrs. Marie Pecquet to enter into it. See Arts. 1775, 1779, 124 C. C.; *Roberts* v. *Wilkinson*, 5 Al. 369; *Terrell* v. *Yoe*, 2 A. 903; *Moussier* v. *Zunts*, 14 A. 18. And no proceeding was necessary in advance or simultaneously with this one against the principal debtor, before a resort against the sureties. *Boullé, f. m. c.,* v. *Martin et al.,* 14 La. 135.

This disposes of the exception to the action filed by the defendants.

The nature of the obligation contracted by Louis J. Pecquet and Marie, his wife, being ascertained, is it one "où la solidarité a lieu de plein droit en vertu d'une disposition de la loi?" On the authority of Duranton, liv. 3, tit. 14, § 341, du Cautionnement, "Lorsque plusieurs personnes se sont rendus cautions d'un même débiteur, pour une même dette, elles sont obligées chacune à toute la dette; parceque chacune d'elles l'a effectivement cautionné en entier, en ne restreignant point son cautionnement sur le pied d'une part seulement, sauf ce qui va être dit sur le bénéfice de divisions."

The case of *McCausland* v. *Lyons*, 4 A. 274, is in point and meets our full concurrence.

The court says: "Under the provisions of our law the contract of suretyship is of a mixed character.

The obligation of the surety is to pay the whole debt; but this solidarity is tempered by the right of division. The right, however, vests in *facultate.*

The surety has the right to demand the division; but until the right is exercised, the obligation is solidary."

In the case cited, as in the one now pending, there has been no demand of division by the sureties. They were attacked by the plaintiffs as debtors *in solido*, and pleaded the general issue.

The exception is a peremptory one, which must be pleaded specially; and this has not been done in the court below, nor even in this court."

*Dividitur obligatio inter plures fidejussores per exceptionem duntaxat, non ipso jure.* It is not an exception that can be supplied by the court. See Troplong, Cautionnement, § 297, and the authorities there cited; Merlin, Répertoire, verbo Caution, § 4, No. 2.

5. Has the condition happened to fix the liability of Louis Joseph Pecquet and Marie, his wife?

The judge *a quo* thought that there was sufficient evidence in the record to show that one of the events, to wit: the failure of Nemours Pecquet, had occurred, and that the obligation assumed by Louis J. Pecquet and wife had thereby become absolute. In this view we concur; and we consider them legally bound *in solido* for the whole amount claimed, principal and interest.

6. And this brings us to the last question : From what period must in-

terest be computed ?  From the date of the failure of Nemours Pecquet, <span>PECQUET<br>*v.*<br>PECQUET'S EX'R.</span>
or from judicial demand ?

This question is not free from difficulty; but we have no hesitation, after due reflection, in restricting the claim for interest, so as to compute it only from judicial demand.  The principal sum, it is true, was due by the defendants at the time of the failure of Nemours Pecquet, and they could only retain it by paying the annual stipulated interest; but, so long as Nemours retained possession of the fund, which was the *paraphernal* property of his wife, the fruits, or the interest thereof, belonged to the community of acquêts, still existing between them.  See Art. 2363, C. C. *Rowley* v. *Rowley*, 19 La. 580.

Had the plaintiff, instead of sueing her husband's sureties, brought suit directly against him, it is very evident she could not have recovered interest except from judicial demand, and perhaps from the date of the rendition of judgment; and, as the suretyship cannot exceed what may be due by the debtor, nor be contracted under more onerous conditions, it must, in either contingency, be restricted or reduced to the conditions of the principal obligation.  See Art. 3006 La. Code.

By paying the claim of Mrs. Catherine Pecquet, L. Joseph Pecquet and wife become legally subrogated to her rights, and to nothing more.  2157 § 3 C. C.

Upon a careful examination of the whole case, we think that the law and the evidence are in favor of the plaintiff, and entitle her to the judgment which will now be rendered.

It is therefore ordered, adjudged and decreed, that the judgment of the lower court be annulled, avoided and reversed, and proceeding to give such judgment as should have been rendered by the said court :

It is ordered, adjudged and decreed, that judgment be and it is hereby rendered in favor of the plaintiff, Mrs. Catherine Ambler Moncure, wife of Nemours Pecquet, and against the defendants, *in solido*, to wit : the succession of Louis Joseph Pecquet, opened in the Second District Court of New Orleans, and Mrs. Marie Collette Ducongé, widow of the said Louis Joseph Pecquet, in the sum of twenty-seven thousand dollars, with legal interest, five per cent. per annum, from judicial demand, the 7th June, 1859, till paid, and the costs of suit in both courts, the judgment now rendered against the succession of Louis Joseph Pecquet to be paid in due course of administration.